[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION RE MOTION FOR THE DETERMINATION OF LEGAL ISSUES
The motion now before the court raises the important question of whether Conn. Gen. Stat. § 31-51q, which prohibits employers from the "discipline or discharge" of employees on account of the employees' exercise of certain constitutional rights, applies to employers who fail to promote employees because of the exercise of those rights. For the reasons set forth below, the answer to this question is No.
The plaintiff, Leo Bombalicki, commenced this action by service of process on September 18, 1995, against three defendants: Nicholas Pastore, who was then the Chief of Police of New Haven; the New Haven Board of Police Commissioners; and the City of New Haven. Bombalicki's complaint consists of three counts. The first count contains the bulk of the factual allegations. Bombalicki claims that he is a sergeant in the New Haven police force with a distinguished record. In 1993, he took a civil service examination for promotion to lieutenant. of the 35 people who passed that examination, he ranked 15th. New Haven Charter § 191 provides that whenever a City board shall have adopted rules relative to the appointment or promotion of any class of officials, "no appointments or promotions within such class shall be made except from those applicants, not exceeding three, who shall stand highest on the list of those who shall have passed an examination . . . and are upon the list of those eligible to such position or promotion." Bombalicki further alleges that: CT Page 5684
 On September 27, 1994, the defendant Pastore recommended, and the defendant New Haven Board of Police Commissioners approved, the promotion to the rank of Lieutenant of the Sergeants ranked numbers 1 through 13, numbers 17 through 20, number 22 and number 25 on the aforesaid Civil service eligibility list, thereby failing and refusing to promote the plaintiff as required by the aforesaid provisions of the New Haven Charter.
The first count of the complaint alleges that the asserted failure to promote violated the New Haven Charter. The second count alleges that the asserted failure was on account of Bombalicki's exercise of free speech and thus violated Conn. Gen. Stat. § 31-51q. The third count alleges intentional infliction of emotional distress.
On November 22, 1995, the defendants filed an answer and a special defense asserting that, "The Plaintiffs claims are barred under the Doctrine of Governmental Immunity." On March 7, 1997, the defendants amended their answer to assert six special defenses. Under the answer as amended, the first special defense asserts that the New Haven Charter does not entitle the plaintiff to a promotion; the second and third special defenses allege that the defendants are immune from liability; the fourth special defense alleges a failure to exhaust administrative remedies; the fifth special defense alleges that Pastore has no power or authority to promote the plaintiff; and the sixth special defense asserts that the second count of the complaint fails to state a claim upon which relief can be granted.
In this primal state the file stood in unencumbered grandeur for three years. In spite of the fact that, as mentioned, the sixth special defense (which is not a special defense; see P.B. § 10-50) asserts that the second count fails to state a claim upon which relief can be granted, no motion to strike has ever been filed. (Under the Rules of Practice, a motion to strike should, of course, have been filed prior to the answer; see P.B. § 10-6.) On March 29, 2000, the case was assigned to this court for jury selection. In the course of pretrial discussions, it became apparent that a number of complex legal issues were presented by the first two counts of the complaint.
The parties agreed that these issues should be addressed by way of considered pretrial briefs and argument, and a brief continuance was granted for this purpose. The Court requested the defendants to file an appropriate motion and ordered both parties to brief a number of issues. The parties have since resolved the outstanding CT Page 5685 issues with respect to the first count, and those issues need not be mentioned. With respect to the second count, the Court ordered the parties to brief the question of whether Conn. Gen. Stat. § 31-51q
applies to the asserted failure to promote alleged in the complaint and, if so, whether the second count should be tried to the court or the jury. (Because of the Court's analysis of the first question, the second need not be discussed.)
On April 7, 2000, pursuant to the Court's order, the defendants filed the motion for determination of legal issues and/or for the entry of summary judgment now before the court. The motion was argued on May 1, 2000. The case was submitted by way of postargument briefs on May 9, 2000.
Conn. Gen. Stat. § 31-51q provides as follows:
 Liability of employer for discipline or discharge of employee on account of employee's exercise of certain constitutional rights. Any employer, including the state and any instrumentality or political subdivision thereof, who subjects any employee to discipline or discharge on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4 or 14 of article first of the Constitution of the state, provided such activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer, shall be liable to such employee for damages caused by such discipline or discharge, including punitive damages, and for reasonable attorney's fees as part of the costs of any such action for damages. If the court determines that such action for damages was brought without substantial justification, the court may award costs and reasonable attorney's fees to the employer.
Was the failure to promote asserted in Bombalicki's complaint "discipline or discharge" within the meaning of this statute? Bombalicki admitted at argument that he had not been "discharged." It is thus common ground that the question presented boils down to whether the statutory term "discipline" applies to the asserted facts of this case.
The word "discipline" is not statutorily defined, and neither court nor counsel have discovered any case law addressing this point in the CT Page 5686 context of the statute at hand. It is, consequently, necessary to draw on other source. Fortunately, several sources are available to illuminate the text: (1) dictionary definitions of the word "discipline"; (2) internal clues elsewhere in the statutory text; (3) the legislative history of the statute; and (4) the use of the word "discipline" in analogous Connecticut statutes. After these sources have been considered, the pertinent policy considerations must also be reviewed.
Webster defines "discipline" as meaning "to inflict suffering on or to penalize for the sake of discipline, regularity, order, or rule." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 645 (1971). The definition in BLACK'S LAW DICTIONARY sheds somewhat more light on the legal meaning of the term. Black defines "discipline" as "[p]unishment intended to correct or instruct, esp. a sanction or penalty imposed after an official finding of misconduct." BLACK'S LAW DICTIONARY 476 (7th ed. 1999). Both of these definitions involve affirmative acts of chastisement. This is in keeping with a use of the term going back to the dawn of the English language. The OXFORD ENGLISH DICTIONARY informs us that "the earliest English sense" of the term was "its monastic use" referring to "the mortification of the flesh by penance." 4 OXFORD ENGLISH DICTIONARY 735 (2d ed. 1989). In all of these definitions, "discipline" involves affirmative acts of punishment that (at least while the punishment is being inflicted) leave the recipients in a less happy state than that which they enjoyed before the punishment began. A withholding of a benefit — even a benefit that was due or promised — does not fit this pattern. "Discipline" is an affirmative act of deprivation that diminishes the status or happiness of the recipient rather than a failure to enhance that status or happiness.
The internal text of Conn. Gen. Stat. § 31-51q contains a least a hint that reinforces the dictionary meaning. An employee cannot be disciplined or discharged on account of certain protected activity, "provided such activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee or the employer." This qualification plainly refers to the status quo. It does not refer to a new or superior "job performance" or "working relationship," even one that may be due or promised.
The legislative history of the statute in question contains a similar hint. In introducing the bill to the House of Representatives, Representative Richard Tulisano stated that the legislation would protect the "rights of individuals, so they do not have to be afraid to express themselves because of fear of job loss." 26 H.R. Proc., pt. 14, 1983 Sess., p. 5289, remarks of Representative Richard Tulisano. This CT Page 5687 remark plainly envisions "discipline" as an affirmative act of punishment that leaves the employee less well off than he was before.
The use of the word "discipline" in analogous Connecticut statutes must now be considered. The phrase "discipline or discharge" was not newly coined for purposes of Conn. Gen. Stat. § 31-51q. When that statute was enacted in 1983; see 1983 Conn. Acts. No. 83-578; three other statutes using the same phrase were already on the books. Significantly, however, § 31-51q employed the phrase "discipline or discharge" in a more restrictive way than did those earlier statutes. To put the matter another way, the earlier statutes using the phrase in question were significantly more expansive in their text than § 31-51q. Thus, the first of these earlier statutes, Conn. Gen. Stat. § 2-3a
(1983), prohibiting employers from discriminating against candidates for or members of the general assembly, provides that, "No employer of twenty-five or more persons shall discriminate against, discipline or discharge any employee because such employee is a candidate." (Emphasis added.) Second, Conn. Gen. Stat. § 31-51g(b)(1) (1983), prohibiting employers from using polygraph examinations, provides that an employer shall not "dismiss or discipline in any manner an employee for failing, refusing or declining to submit to or take a polygraph examination." (Emphasis added.) Finally, Conn. Gen. Stat. § 31-51m(b) (1983), popularly known as the "whistle blower" statute, provides that, "No employer shall discharge, discipline or otherwise penalize any employee because the employee . . . reports . . . a violation . . . to a public body." (Emphasis added.) Each of these statutory texts was available as a possible model when Conn. Gen. Stat. § 31-51q was enacted in 1983. In fact, § 31-51m had just been enacted in the previous year. See 1982 Conn. Acts No. 82-289. In spite of the availability of these role models, the legislature chose to use the unadorned phrase "discipline or discharge" without the expansive terminology attached to that phrase in the earlier statutes. This history creates a strong inference that the legislature intended § 31-51q to be at least somewhat more restrictive than the analogous statutes then on the books.
In addition to this consideration, the text of Conn. Gen. Stat. § 2-3a
(1983) provides a significant clue that even a relatively expansive use of the phrase "discipline or discharge" (coupled, in the case of § 2-3a, with the term "discriminate against") was not intended to apply to the denial of a promotion. In addition to its express prohibition, § 2-3a
contains a specific remedy provision. That statute provides that, "Any employer violating the provisions of this section shall reinstate any employee so discriminated against, disciplined or discharged to his full status as an employee as of the date of such violation." (Emphasis added.) This provision would make no sense when applied to a failure to promote. If, as seems inevitable from the provision just quoted, § 2-3a, CT Page 5688 with its expansive language, cannot sensibly be applied to a failure to promote, § 31-51q, with its restrictive language, is incapable of application to this situation as well.
Certain policy arguments raised by Bombalicki must now be reviewed. In Bombalicki's estimation, § 31-51q was intended by the legislature to give Connecticut employees a state analogue to the benefits such employees enjoy under two well-known federal statutes, 42 U.S.C. § 1983
and 42 U.S.C. § 2000e-2 (popularly known as Title VII). It is well established the statutes just cited prohibit certain discriminatory failures to promote. See Hishon v. King Spalding, 467 U.S. 69 (1984) (Title VII); Tao v. Freeh, 27 F.3d 635 (D.C. Cir. 1994) (§ 1983). Those statutes are worded with an unmistakably broader brush than that used to draft § 31-51q. Thus, § 1983 prohibits the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws." Title VII makes it an unlawful employment practice "to fail or refuse to hire or discharge any individual, or otherwise to discriminateagainst any individual with respect to his compensation, terms,conditions, or privileges of employment." 42 U.S.C. § 2000e-2 (a)(1). (Emphasis added.) The language of § 31-51q, which as explained above is restrictive even by Connecticut standards, simply cannot compare with the expansive texts of these asserted federal counterparts.
There may well be sound policy reasons for creating a legal rule that an employer cannot be denied a promotion because of the exercise ofFirst Amendment rights. The second count of Bombalicki's complaint, however, relies solely upon § 31-51q to establish this proposition. For the reasons explained above, § 31-51q is too slender a reed to bear this weight.
The motion for determination of legal issues and/or for the entry of summary judgment is granted. Judgment shall enter in favor of the defendants on the second count the complaint.
 Jon C. Blue Judge of the Superior Court